UNITED STATES of America,
Plaintiff,

v.

A. J. SMITH, Abe Yeddis, Henry A. Ruysser, Jr., William C. McCool, Frank J. Ruysser, R. S. Wilkins, James J. Stratton, Charles H. Myers, Herbert C. Bartlett, Martin Grinter, individually and as partners, doing business as Smith Engineering Company, and Smith Engineering Company, a partnership, Defendants.

No. 9891.

United States District Court
W. D. Missouri, W. D.
March 30, 1960.

Edward L. Scheufler, U. S. Atty., Joseph L. Flynn, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Roy K. Dietrich, Dietrich, Tyler, Davis, Burrell & Dicus, Chester B. Kaplan, Kansas City, Mo., Bernard J. Ruysser, Kansas City, Kan., Rope, Shanberg & Rope, George L. Gordon, Donald W. Johnson, Kansas City, Mo., for defendants.

R. JASPER SMITH, District Judge.

Action by the United States in four counts. In Count I plaintiff's claim is for rent in the amount of $18,900 due from defendants under lease agreement No. W–25–075–eng–8336 between the United States as lessor and Smith Engineering Company as lessee, executed by lessor on May 11, 1948. The lease covered part of Building 4 and all of Building 6 at the Lake City Arsenal, Independence, Missouri. The amount of rental per month was $5,590. The amount alleged to be unpaid covers the period commencing August 1, 1949, to and including the expiration date of the lease, November 30, 1949, or a period of four months, less a partial payment of $4,900. Defendants admit the nonpayment of the claimed balance of $18,900, and that demand was made for payment of that amount on June 11, 1953.

The second Count refers to a second lease, No. W–25–075–eng–8320, for certain additional property at the Lake City Arsenal. The term of this second lease was for a period of two years commencing September 1, 1947, and ending August 31, 1949, at a stipulated rental for the entire period of $3,078 to be paid at the rate of $256 per month in advance. Defendants occupied these premises beyond the term of the lease up to and including May 25, 1950. No rental was paid for the period of October 1, 1949, through May 25, 1950. The rent for the period was alleged to be $2,009.25 with $200 having been paid on this amount by defendants, leaving a balance due as prayed in the Second Count of $1,809.25. Defendants admit nonpayment of this

amount, and admit that demand was made on June 11, 1953.

In Count III, the Government prays for $198,500 under the provisions of Paragraph 19(c) of Lease No. W–25–075–eng–8336, as the estimated cost of returning the property to "stand-by condition for extended storage".

In Count IV, plaintiff seeks to recover payment of $1,944, as damages to the building and property covered by the two leases, and alleged to have been caused by defendants as lessees, the damage being in excess of what would be considered normal wear and tear.

Thus it will be seen that the major controversy concerns itself with the subject matter of Count III, and substantially all of the testimony was devoted to the issues there raised. For a complete understanding of the issues presented, some detailed facts must be stated.

Individual defendants were partners operating under the name Smith Engineering Company. Sometime in the latter part of 1946, the partnership became the owner of Continental Industries, Inc. This corporation had an outstanding contract with the Government for the production of 50,000 caskets. Continental Industries, Inc. had its manufacturing establishment in Chicago, and these facilities were inadequate to handle the manufacture of these caskets. The partnership, in order to obtain adequate space, entered into negotiations early in 1947 for certain idle space at the Lake City Arsenal owned by the United States and under the supervision of the Corps of Engineers. Early that year, the United States had offered for lease certain buildings and property no longer being used in the defense effort, including certain parts of the Arsenal. In each instance the property was being leased after securing bids. In the area which is the subject of this controversy here was certain productive equipment required for the manufacture of ammunition, and which was referred to generally in the trial as "bullet machinery". This equipment was highly specialized, and not useable for general manufactur-

ing purposes, including the manufacture of caskets as was contemplated here. It was necessary, therefore, that this "bullet machinery" be moved before the premises were useable for other manufacturing purposes.

By letter dated June 4, 1947, defendants bid for a lease for the use of approximately 155,000 square feet within Building No. 4 of the Lake City Arsenal. This offer was conditioned on right of entry for the purpose of conditioning the building for use within a ten-day period. By it defendants agreed to move all machinery then occupying the space to such storage within the Arsenal as was mutually agreed upon with the Commanding Officer. The offer contained an agreement to maintain the leased property in the condition as it existed, returning it at the expiration of the lease in as good condition as it was received, normal wear and tear excepted.

On June 17, 1947, the Government mailed to defendants a right of entry granting the use of the portion of Building No. 4 pending determination of the successful bidder for the lease of the area in question. The authorization for this right of entry was forwarded from Washington to the Omaha, Nebraska, Office of the Corps of Engineers by teletype on June 13, 1947. The authorization and the subsequent right of entry executed on June 17, 1947, provided that the defendants were authorized to remove productive equipment from the area to designated storage facilities; that defendants were to replace or repair any machinery that was damaged or destroyed in the process of removal; and that in the event the defendants were not the successful bidders or that the terms of the lease could not be agreed upon, the defendants were to surrender possession and to restore the premises to the condition in which they were received.

By letter dated July 3, 1947, the defendants were notified that they had been the successful bidders. On or about June 13, 1947, defendants had entered the premises in Building No. 4, and under the direction of Government representatives immediately commenced to move the bullet making machinery from the area proposed to be leased. Most of this machinery was stored in Building No. 4 in areas not leased. It was fenced in, padlocked by the Government, and thereafter remained under the complete and exclusive control of the Government with defendants having no access to it whatever.

In addition to the Right of Entry previously mentioned, on June 24, 1947, a further Right of Entry was given to defendants as prospective lessees to the roads leading to and from Building No. 4. The pertinent provisions of this Right of Entry are similar to those previously mentioned.

On July 9, 1947, defendants submitted an offer to the Government to lease additional space in Building No. 4 and also to lease Building No. 6. By letter of July 18, 1947, the Government accepted this offer subject to the conditions of a Right of Entry on the additional space which was subsequently granted and accepted and which contained conditions substantially identical with the earlier Rights of Entry.

On July 23, 1947, defendants offered to lease an additional amount of space in Building No. 4, which was accepted by the Government and included in the formal lease. The lease in controversy was executed by defendants on April 21, 1948, and by the Government on May 11, 1948. It covered approximately 186,000 square feet in Building No. 4 and all of Building No. 6, and by its terms extended from July 1, 1947, to November 30, 1949. The evidence shows that substantially all of the bullet machinery was moved by July 1, 1947.

On July 10, 1950, the Government notified defendants that it elected to accept the leased property in an "as is" condition under Clause 19(c) of the lease and have defendants pay the estimated cost of returning the property to "standby condition for extended storage." The estimated cost to accomplish this was in the amount of $200,000. It should be

noted that certain machinery belonging to the Government was actually used by defendants in their manufacturing processes. The machinery used consisted mainly of machine tools which had been in the machine shop in Building No. 4. Upon inquiry by defendants as to what the Government expected them to do by way of repairing and restoring the premises, substantial repairs were made, and the machine tools thereafter were placed in standby condition for extended storage under the direction of representatives of the Government and accepted by the Government.

The formal lease is quite long, and will not be incorporated in this Memorandum in full. Certain provisions are of particular significance.

The first page of the lease instrument provides that the lease is to cover:

" * * * the following described land and buildings, improvements, machinery, and appurtenances thereunto belonging, hereinafter referred to as the 'Leased Property', to be used for manufacturing purposes:

"All of Building No. 6 and approximately 186,000 square feet of space within Building No. 4 as shown in red on the plat of said building attached hereto, made a part hereof, and marked 'Exhibit A', together with the land areas as shown in red on the map attached hereto, made a part hereof, and marked 'Exhibit B', together with the right of ingress and egress to the property leased and the right to use the railroad spur tracks from the classification yards to said Building No. 4, all within the area of Lake City Arsenal, Missouri."

Paragraph 3 of the lease is as follows:

"3. That upon execution of this lease on behalf of the Government and on behalf of the Lessee, a survey and inventory of the Leased Property including, but not limited to all supplies, machinery, equipment and tools embraced therein, shall be made by a representative of the Government and a representative of the lessee. Said survey and inventory shall be submitted to the Division Engineer for approval, and upon approval, a copy thereof shall be attached hereto and become a part hereof as fully as if originally incorporated herein. There shall be added to said survey and inventory from time to time such additional Government property, fixtures and installations as are furnished by or at the expense of the Government. At the expiration or termination of this lease, a similar survey and inventory shall be prepared and submitted to the Division Engineer, said survey and inventory to constitute the basis for settlement by the Lessee with the Division Engineer for leased property shown to be lost, damaged or destroyed, any such property to be either replaced or restored or at the election of the Government reimbursement made therefor by the Lessee at the then current market value thereof. Supplies included in the survey and inventory which are used by the Lessee shall be, at the election of the Government, either replaced to stores in kind or reimbursement therefor shall be made by the Lessee at the then current market value thereof upon the expiration or termination of this lease."

Paragraph 19, which is the significant paragraph as it relates to Count III, is as follows:

"19. That upon the expiration or other termination of this lease, the Lessee shall, if required by the Government, (a) remove such of its property as has not become the property of the Government under the terms of this lease and within the shortest possible time, but in no case in excess of 120 days from the date written notice of termination is received, or from the date of expiration, restore the Leased Property to as good order and condition as that existing upon the date of commence-

ment of the term of this lease, less ordinary wear and tear, and damage to the Leased Property covered by insurance and for which the Government shall receive, or has received, insurance funds in lieu of having the damaged property repaired, replaced, or restored, and place the Leased Property in 'Standby condition for extended storage', according to established industrial standards, and in accordance with any additional specifications furnished to the Lessee by the Division Engineer, the cost of so restoring the Leased Property and so placing the Leased Property in standby condition for extended storage to be borne by the Lessee, or (b) remove such of its property as has not become the property of the Government under the terms of this lease, and within the shortest possible time place the Leased Property in an operating condition suitable for the Government's production purposes, provided, however, in the event the cost of placing the Leased Property in said operating condition is in excess of the estimated cost of restoring the Leased Property and placing it in 'Standby Condition for extended storage' as required by Condition 19(a) of this lease the Government shall pay the Lessee the amount of the difference in said costs, and in the event the cost of placing the Leased Property in said operating condition is less than the estimated cost of restoring the Leased Property and placing it in 'Standby Condition for extended storage' as required by Condition 19(a) of this lease, the Lessee shall pay the Government the amount of the difference of said costs, or (c) return the Leased Property to the Government in an 'as is' condition, the Lessee to pay the Government the amount of the estimated cost of restoring the Leased Property and placing it in 'Standby Condition for extended storage' as required by Condition 19(a) of this lease. In the event the Division Engineer elects upon expiration or other termination of this lease to have the Leased Property restored and placed in standby condition for extended storage as required by Condition 19 (a), or placed in an operating condition as required by Condition 19 (b), the Lessee shall upon the completion of the work required thereby, immediately and peaceably yield the same to the Government in said condition. If the Lessee shall fail or neglect to remove its property, or to restore the Leased Property or to place the Leased Property in standby condition for extended storage, or to yield the Leased Property, as herein provided, then the Government may cause the property of the Lessee to be removed, and the Leased Property to be restored and conditioned, and the cost of such removal, restoration and conditioning shall be paid by the Lessee to the Government upon demand, and no claim for damages against the Government or its officers or agents shall be created by or made on account of such removal, restoration or conditioning. In aid of its obligation so to return the Leased Property, the Lessee shall maintain a program for the proper use, care and maintenance of the Leased Property, as well as a property control and accounting system consistent with good business practice."

A condition survey of the premises on behalf of the Government and the defendants, setting out "A Survey and Inventory of the Leased Property, including All Supplies, Machinery, Equipment and Tools Embraced therein", was made at the time defendant took possession of Building No. 4. This was in accordance with the requirements of Paragraph 3 of the lease. A terminal survey identical in scope was commenced on January 9, 1950, and completed on January 16, 1950. This survey, executed by the Government on August 28, 1950, and by defendants on November 20, 1950,

shows certain additional work performed by defendants as requested by plaintiff in the way of additional repairs. The machinery used by defendants, which consisted mainly of machine tools which had been in the machine shop in Building No. 4, was placed in "Standby Condition for extended storage" and accepted by the Government. All other equipment leased to defendants was returned to and accepted by the Government.

At no time during these negotiations was request made to defendants to replace the bullet machinery which had been removed by defendants under Government direction, and no discussion relating to the bullet machinery ensued from that time until the time suit was brought here.

Interestingly enough both plaintiff and defendants insist that there is no ambiguity in the lease and that under its plain language each side is entitled to prevail. Both parties insist if there is any ambiguity in the lease instruments, the extrinsic evidence admissible to aid in their construction will in fact support their respective interpretations.

Both parties were permitted extensive leeway in the presentation of evidence during trial in support of their respective positions. Both of them have pointed to the history of the transactions, including the various rights of entry, offers, actions of the parties and the like, leading up to execution of the formal lease contract, as bearing on its interpretation and legal effect.

■ Parol evidence cannot be used to alter an integrated, unambiguous contract and matters concerning previous negotiations, understandings, and transactions may only be considered in the instances where the instrument does not have a plain, legal meaning. See National Surety Corp. v. Curators of University of Mo., 8 Cir., 1959, 268 F.2d 525, and cases cited therein.

■ In my view the lease instrument is not ambiguous, and reference to interpretations by the parties or other extrinsic activities including the language of offers, rights of entry, and matters of like character have no significance here.

The granting clause of the lease covers "the following described land and buildings, improvements, machinery and appurtenances thereunto belonging", and by that sentence, that property is designated as the "Leased Property".

Paragraph 3 of the lease calls for the making of a complete survey and inventory of the "leased property"; and that survey was incorporated as a part of the lease by the terms of that paragraph. The survey was made, and was itemized in meticulous detail. Such machinery as was included and which was to be used by defendants was carefully listed by serial number when that number was available.

By the precise terms of the lease agreement "leased property" consisted of the area itself, and the "supplies, machinery, equipment and tools embraced therein * * *." It necessarily follows that machinery not included in the inventory was not included within the meaning of "leased property".

With this interpretation of the meaning of the contract, an examination of Paragraph 19(a) discloses that lessee is required to remove such of its property as has not become the property of the Government, and restore the "leased property" to as good order and condition as that existing upon the date of commencement of the lease, less ordinary wear and tear, and to place the "leased property" in "standby condition for extended storage" at lessee's cost. This apparently has been done, except for the possible claim under Count IV. The alternate requirement of (b) requires the Lessee to place the "leased property" in an operating condition suitable for the Government's production purposes under certain conditions. Alternate (c) requires Lessee to return the "leased property" in an "as is" condition, the Lessee to pay the Government the amount of the estimated cost of restoring the "leased property" and placing it in

**50**

"standby condition for extended storage".

Nowhere in the lease is any reference made to bullet machinery, or production equipment as that term is defined. Although the Government on January 10, 1950, notified defendants that it proposed to exercise the election under 19(c), taking the leased property in an "as is" condition, it is apparent that as to the "leased property", the Government abandoned that election and proceeded to have property included in the inventory and survey placed in "standby condition for extended storage" under 19(a).

The fact that there may have been a requirement in an earlier Right of Entry requiring defendants to restore the "productive equipment" to its previous condition in the event the Company was not a successful bidder or in the event of failure to agree on the terms of the lease is of no consequence after those documents became merged in the formal lease agreement. The conclusion is apparent that no obligation exists under the lease provisions for defendants to take any action or incur any expense in connection with the restoration of the bullet machinery to its original location and installation. Plaintiff is therefore not entitled to recover on Count III.

As to Count I, judgment will be entered in favor of the plaintiff and against the defendants in the sum of $18,900, with interest as required by law.

As to Count II, judgment will be entered in favor of the plaintiff and against the defendants in the amount of $1,809.-25, with interest as required by law.

As to Count III, judgment will be entered in favor of the defendants and against plaintiff.

As to Count IV, in view of the fact that no proof was made concerning the items making up the claim for damages, judgment will be entered in favor of the defendants and against plaintiff.

The parties will submit form of judgment entry within 15 days.

It is so ordered.